UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE: | . | Case No. 10-31635 (MCR) |
| | . | |
| | . | |
| ROY MENTON and | . | 100 S. Clinton Street |
| MAUREEN MENTON, | . | Syracuse, NY 13261 |
| | . | |
| Debtors. | . | |
| | . | April 26, 2011 |
| . . . . . . . . . . . .. | | 3:09 p.m. |

TRANSCRIPT OF ORDER TO SHOW CAUSE
BEFORE HONORABLE MARGARET CANGILOS-RUIZ
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

| | |
|---|---|
| For the Debtors and Sean Serpe: | Serpe & Associates, P.C.<br>By:  SEAN C. SERPE, ESQ.<br>450 Seventh Avenue, Suite 2601<br>New York, NY 10123 |
| For the Office of the United States Trustee: | Office of the United States Trustee<br>By:  GUY A. VAN BAALEN, ESQ.<br>10 Broad Street<br>Utica, NY 13501 |
| For the Chapter 13 Trustee: | Office of Mark W. Swimelar<br>By:  LYNN HARPER WILSON, ESQ.<br>250 South Clinton Street, Suite 203<br>Syracuse, NY 13202 |
| Audio Operator: | Nicole Smith |


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609)586-2311     Fax No. (609)587-3599**

APPEARANCES (cont'd):

For Citizens Bank of        Green & Seifter
Cape Vincent:               By:  DAVID C. TEMES, ESQ.
                                 JASON CENTOLELLA, ESQ.
                            110 W. Fayette Street, Suite 900
                            Syracuse, NY 13202


                        - - -

# **I N D E X**

**PAGE**

**WITNESSES**
SEAN C. SERPE
  Examination by the Court           5
  Examination by Mr. Van Baalen    29

ROY MENTON
  Examination by the Court           36

**DECISION**
  By the Court           40

1          COURTROOM DEPUTY:  All rise.

2          THE COURT:  You may be seated.

3          COURTROOM DEPUTY:  Today is Tuesday, April 26th,

4  2011.  This is the 3 p.m. calendar.  The case to be heard is

5  Roy and Maureen Menton, 10-31635.  This is the order to show

6  cause.  Will the attorneys please note their appearances?

7          MR. SERPE:  Good afternoon, Your Honor.  Sean Serpe

8  appearing on behalf of myself and Mr. Menton.

9          MS. WILSON:  Lynn Harper Wilson for the trustee.

10          MR. VAN BAALEN:  Guy Van Baalen for the United States

11  Trustee.

12          MR. CENTOLELLA:  Jason Centolella on behalf of the

13  Citizens Bank of Cape Vincent.

14          MR. TEMES:  David Temes on behalf of Citizens Bank of

15  Cape Vincent.

16          MR. MENTON:  Roy Menton.

17          THE COURT:  Okay.  The Court has made this motion --

18  entered an order to show cause and is going to proceed with an

19  evidentiary hearing.  And I think I'm going to first have Mr.

20  Serpe come up and be sworn, please.  And Mr. Serpe, before you

21  take the -- be sworn in, what papers did you bring with you

22  today?  Did you bring a copy of the response that you have

23  filed?  Why don't you bring that with you?

24          MR. SERPE:  (indiscernible)

25          THE COURT:  And any other papers that you feel you've

Serpe - Court                                                   5

1  brought with you today that you need.

2        COURTROOM DEPUTY:  Please raise your right hand.

3             SEAN C. SERPE, WITNESS, SWORN

4        COURTROOM DEPUTY:  State your full name and spell

5  your last name.

6        THE WITNESS:  My name is Sean Serpe.  My last name is

7  spelled S-e-r-p-e.

8                        EXAMINATION

9  BY THE COURT:

10 Q    Mr. Serpe, you have represented the debtors in the current

11 proceeding and in the proceeding that was filed previously, is

12 that right?

13 A    That is correct, Your Honor.

14 Q    And we are here today because this Court entered an order

15 on March the 2nd, 2011 that had an ordering paragraph in it

16 with respect to certain required filings that were to be made

17 by March the 15th, in this case by court directive.

18        THE COURT:  Carolyn, would you please hand this order

19 over to the witness?

20 Q    Mr. Serpe, by virtue of my directed clause on Page 2 that

21 is marked and bracketed, would you please read into the record

22 what that order directed?

23 A    Yes, Your Honor.  It ordered that Attorney Serpe file an

24 affidavit disclosing the time and amount and basis for all fees

25 paid to the firm by or on behalf of the debtors in 2009, 2010

Serpe - Court                                                    6

1  and 2011, up to the present, and that such affidavit address

2  any funds held on behalf of debtors in a trust account for any

3  reason including but not limited to any funds returned from

4  Sysco to Attorney Serpe as a result of wrongful garnishment.

5  Q    Okay.  And have you complied with that order to date?

6  A    Your Honor, I attempted in my response yesterday to you to

7  comply with that order.

8  Q    You have a response that was filed April the 25th, is that

9  right?

10  A    Yes, Your Honor.

11  Q    And did you subsequently file another document in this

12  court?

13  A    I incorrectly didn't file the affidavit.  I apologize for

14  that, Your Honor.  I had filed the exhibits, then I filed the

15  affidavit subsequent to that.

16  Q    Now, the affidavit has approximately 42 paragraphs.

17  A    Correct, Your Honor.

18  Q    With respect to those paragraphs and the directive that

19  you disclose what you have been paid --

20  A    Yes, Your Honor.

21  Q    -- follow your affidavit right now, please, and tell me

22  what you're disclosing to the Court in your affidavit.

23  A    Absolutely, Your Honor.  I disclosed in the affidavit in

24  Paragraph 2 -- or Paragraph 4, I should say -- that on March

25  24th, 2009, the Mentons and I signed a retainer agreement.  The

Serpe - Court                                          7

1  fee for that representation was -- that was for debt settlement

2  services.   The fee for that representation was a flat fee of

3  $2,000.   I attached a copy of the retainer exhibit as Exhibit

4  B.   The Mentons paid the retainer to my firm in five monthly

5  installments of $400.   And I attached that as Exhibit C.

6  Q     So, Paragraphs 4 and 5 address the $2,000 that was paid to

7  your firm for debt settlement services.

8  A     Yes, ma'am.

9  Q     And what other paragraphs in that affidavit address the

10  payments you received or your firm?

11  A     Yes, Your Honor.   It would be Paragraph 25.   In September,

12  2010, my office received reimbursement from the Mentons for two

13  prior case filings, $548, as well as the fees for credit

14  counseling and debtor education, $200, credit reports, $100,

15  the first payment to the Chapter 13 trustee, $690, fee for an

16  appearance counsel, $75, and fees for my travel to Syracuse and

17  Federal Express and mailings, which my firm discounted to 387.

18  My firm has received no other funds from the Mentons.

19  Q     So, your testimony in that paragraph is that you were paid

20  $2,000 in connection with what you've just recited.

21  A     Yes, Your Honor.   And then, Your Honor, in Appendix A,

22  what I attempted to do was just list out all the pertinent days

23  that -- the time sheet that we'd actually worked on the matter

24  from February 18th of 2009 through March 22nd of 2011.

25  Q     There's no time indicated in those entries, though, is

Serpe - Court                                     8

1  there?

2  A    There's not, Your Honor.

3  Q    And it's your sworn testimony before the Court today that

4  that's the only amount you've been paid by these clients?

5  A    Yes, Your Honor.

6  Q    Mr. Serpe, you filed a sworn affidavit in the 2009 case,

7  that's under Federal Rules of Bankruptcy Procedure 2016, that's

8  to disclose what the arrangement is with your client.  Could

9  you explain that 2009 filing?

10  A    Your Honor, the 2009 filing I listed that I had not

11  received any compensation for the bankruptcy case.

12  Q    For legal services, I have agreed to accept, and you've

13  indicated?

14  A    Zero.

15  Q    Prior to the filing of the statement I have received?

16  A    Zero.

17  Q    And the balance that was due?

18  A    I put down zero on that statement, Your Honor.

19  Q    And zero.

20  A    Yes.

21  Q    Okay.

22  A    I'll --

23  Q    That 2009 case was filed December 11th, 2009 and you

24  proceeded to file a plan, did you not?

25  A    Yes, Your Honor.

1  Q    Chapter 13 plan in that case?

2  A    Yes, Your Honor.

3  Q    Did you prepare that Chapter 13 plan?

4  A    I did, Your Honor.

5        THE COURT:   Carolyn, I want you to hand Mr. Serpe

6  this Chapter 13 plan.

7  Q    Could you read what you have indicated under

8  administrative claims in that plan?

9  A    Four thousand dollars, Your Honor.

10 Q    Read the whole amount, please.

11 A    Allowed administrative claims including debtor's

12 attorney's fees in the sum of $4,000 shall be --

13 Q    Including the balance.  Could you read the whole thing,

14 please?

15 A    Sorry, Your Honor.

16 Q    Administrative claims.  Now, read the complete sentence

17 that you inserted in this plan.

18 A    Allowed administrative claims including the balance of the

19 debtor's attorney's fees in the sum of $4,000 shall be paid

20 until -- shall be first until paid in full.

21 Q    What's the basis for that statement in the Chapter 13 plan

22 filed in the 2009 case?

23 A    As far as balance, Your Honor, that's an error on my part.

24 Q    You filed a second case in this court.

25 A    Yes, Your Honor.

Serpe - Court                                    10

1  Q     And that's the current case that we're here?

2  A     Yes, Your Honor.

3  Q     Are you familiar with the sworn 2016 statement that you

4  filed --

5  A     Yes, Your Honor.

6  Q     -- in this case?

7  A     Yes, Your Honor.

8  Q     It's dated July 7th, 2010?

9  A     Yes, Your Honor.

10 Q     What did you indicate for legal services that you have

11 agreed to accept?

12 A     Once again, I listed down a zero.

13 Q     And what did you indicate for prior to the filing of a

14 statement I have received?

15 A     Zero, Your Honor.

16 Q     And the balance due?

17 A     Zero.

18 Q     And you caused to be filed schedules in this court --

19 A     Yes, Your Honor.

20 Q     -- in connection with this case?

21 A     Yes, Your Honor.

22 Q     Are you familiar with the schedules that you filed?

23 A     Yes, Your Honor.

24         THE COURT:  Carolyn, I want you to hand Mr. Serpe and

25 ask him to identify that, please.  And mark it as an exhibit,

Serpe - Court                         11

1   please.  That's C.

2           CAROLYN:  Can you identify it?

3   A     Yes.  These are the schedules that were filed in

4   connection with the second filing.

5   Q     And did you review those schedules before they were filed?

6   A     Yes, Your Honor.

7   Q     Are they true and accurate statements?

8   A     Yes, Your Honor.

9   Q     Could you please take a look at Schedule F?

10  A     Yes, Your Honor.

11  Q     The creditors that are listed.

12  A     Yes, Your Honor.

13  Q     Is there -- what is your firm name?

14  A     It's Serpe & Associates, Your Honor.

15  Q     And is there any indication of the debt owed to Serpe &

16  Associates in those schedules?

17  A     No, Your Honor.

18  Q     Mr. Serpe, when did you commence this current case?

19  A     One second, Your Honor.  June 16th, Your Honor.

20  Q     You have a number of exhibits that you have attached to

21  the response that you have filed here.

22  A     Yes, Your Honor.

23  Q     Now, I call your attention to Exhibit H.  It's a letter.

24  You can identify it for the record, please.

25  A     Yes, Your Honor.  It's a letter from Mr. Swimelar to my

1  office.

2  Q    And there's a receipt stamp in the upper right-hand

3  corner.  What does that indicate?

4  A    August 25th, Your Honor.

5  Q    And is that when your office received this?

6  A    This letter -- I can -- on personal knowledge, I wasn't

7  the one stamping, Your Honor, so I don't know.

8  Q    But, where did that stamp come from and whose initials are

9  those?

10 A    That looks like one of my assistant's initials.

11 Q    Okay.  So, your office received that August 25th.

12 A    Yes, Your Honor.

13 Q    And you've used this as part of your proof with respect to

14 your work involving a loan modification.

15 A    Yes.

16 Q    So, you acknowledge receipt of this letter.

17 A    Yes, Your Honor.

18 Q    Would you please read the third sentence of that letter?

19 A    "However, if Mr. Serpe has additional fees, they must be

20 made by motion and paid through the plan."

21 Q    Now, that was August the 25th that your office received

22 that, is that right?

23 A    Yes, Your Honor.

24 Q    I want you to take a look at your Exhibit C.

25 A    Yes, Your Honor.

Serpe - Court                                    13

1  Q    It indicates that there was an invoice.  Did you issue an

2  invoice on September 1st, 2010?  Is that what that indicates?

3  A    Your Honor, I'm not exactly sure what that actually

4  indicates.  But, it would seem that way, appearing from this

5  that an invoice was issued.

6  Q    And, in fact, there is a payment receipt as part of the

7  pages that you've attached --

8  A    Yes, Your Honor.

9  Q    -- that show that there was an invoice paid --

10 A    Correct, Your Honor.

11 Q    -- with a reference number to a check.  So, tell me about

12 that invoice that was issued September the 1st, 2010.

13 A    Your Honor, it was my firm during the representation.  We

14 -- I had to pay the filing fees both times.  I paid -- advanced

15 50 credit counseling, the debtor education.  I was sick

16 actually in December so I wasn't able to file the plan the

17 first time on time.  When I got back into the office, I filed

18 it.  And I actually cut a check from my own funds to pay for

19 their first plan payment so that they would not be in trouble

20 with the trustee at that point.  And so we were, you know --

21 essentially those were reimbursement for those outlays that we

22 did.

23 Q    In fact, your affidavit addresses what it's for, don't

24 you?

25 A    Yes.

Serpe - Court                          14

1   Q    Paragraph 25.

2   A    Yes, Your Honor.

3   Q    You indicate that it includes reimbursement for two prior

4   case filings.

5   A    Yes, Your Honor.

6   Q    That includes a pre-petition debt that you're claiming now

7   owed to your firm?  This was for the 2009 case, was it not?

8   A    Yes, Your Honor.

9   Q    And you issued an invoice for that to the debtors and

10  accepted estate property to pay for that to your own account?

11  A    Yes, Your Honor.

12  Q    You understand that without being able to receive a dime

13  from the estate, you need an order of this Court.

14  A    Yes, Your Honor.

15  Q    On Exhibit A, perhaps it's B, it's part of Exhibit A.  The

16  last sheet is a client information sheet.

17  A    Yes.

18  Q    Did you include the full social security numbers of your

19  clients when you filed this?

20  A    I didn't realize I was doing that, Your Honor.

21  Q    Mr. Serpe, I'm going to have you focus your attention on

22  why the first case was dismissed.  Paragraph 16?

23  A    Yes, Your Honor.

24  Q    You're required to serve notice of confirmation of the

25  hearing?

Serpe - Court                    15

1  A    Yes, Your Honor.

2  Q    And your explanation in Paragraph 16, you can take a look

3  at it if you need to refresh your recollection as to what you

4  said.

5  A    I remember --

6  Q    What do you indicate there?

7  A    Essentially I didn't realize or came to realize later --

8  actually, no, I didn't realize, Your Honor, that I had to do a

9  notice of confirmation.  So, we took steps to do that and we --

10 you can see in the exhibit that we actually mailed this out and

11 filed a certificate of service.  And at that point, my

12 paralegal and I had thought that we were complete with what we

13 had to do.  I did not realize until subsequently that we

14 actually had not filed the actual notice on ECF, that we'd only

15 filed the certificate of service on ECF.

16 Q    In Paragraph 16 in the second sentence, you're saying your

17 supervision of your paralegal, you overlooked something so that

18 you didn't properly direct your paralegal working under you?

19 Is that your excuse?

20 A    It's not an excuse.  It's my error, Your Honor.  I

21 committed an error in my supervision of my paralegal.

22 Q    And what did you communicate to your clients regarding why

23 their first case was dismissed?

24 A    I had thought, Your Honor that -- I didn't realize the --

25 that it was my error until the trustee actually pointed it out

Serpe - Court                                      16

1  sometime later on the motion to vacate.  I -- when we had filed

2  it, and when we filed the notice and we received the

3  conditional order, we looked and we said good.  We've already

4  taken care of the service at this point.  And I have to tell

5  you I've been working on ECF filings for ten years and this one

6  I missed.  I missed it.  I'm trained in ECF.  I'm proficient in

7  it.  But, I -- it was something new and I had taken care of the

8  service but I didn't -- I missed that in part on this one and I

9  didn't realize it until Ms. Wilson, I think, or whoever filed

10 the objection pointed it out to me at a later point, that I

11 had, in fact, made that error.

12 Q    So, the question that I asked you is, what did you

13 communicate to your client?

14 A    Subsequent, when I realized that it was my error, I told

15 the client.  Initially, I didn't think it was my error.  I

16 thought we had taken care of everything on it.  But, when I did

17 realize that, I did communicate that, that it was my error.

18 Q    Did you communicate to your client that it was a

19 typographical error and that's why the case was dismissed?

20 A    No, I don't think it was typographical.  We just -- we

21 didn't submit the -- I don't remember the specific thing that I

22 said to the client, Your Honor.

23      THE COURT:  I'm going to allow either the Chapter 13

24 trustee or the U.S. Trustee to ask question at this point.

25      MS. WILSON:  No questions, thank you, Your Honor.

Serpe - Court                                    17

1          THE COURT:  Then, I would like the original -- the

2  response that was by Mr. Serpe marked as Exhibit A, 2009 plan

3  marked as Exhibit B.  Let me ask just to -- while the U.S.

4  Trustee is considering questionings.

5  Q    On that 13 plan, the '09 plan, where you said that the

6  balance of debtor's attorneys fees in the sum of $4,000 shall

7  be paid -- shall be first paid until it's paid in full.  Where

8  did that come from?

9  A    Your Honor, what I -- and this is my complete error being

10 with the calculation which was, at that point, with the case

11 pending and with -- what the work we were doing on that, I

12 submitted or I was going to submit a proof of claim for my work

13 on the case or a fee application.  And that was just a

14 roundabout number based on the work that I typically do down in

15 New York in the Southern District, Your Honor.  And it's

16 clearly and obviously my error.

17 Q    You had a 2016 statement, said that you were going to do

18 this case for no fees.  Did you have a retainer agreement with

19 your clients?

20 A    I did not, Your Honor.

21 Q    So, there was no agreement as to what the fees and costs

22 were going to be.

23 A    No, Your Honor, there was not.

24 Q    Is there a retainer agreement for this current case?

25 A    No, Your Honor.

Serpe - Court                              18

1  Q     And so, there's been no communication --

2  A     No, Your Honor, that's --

3  Q     -- as to what the fees and expenses are going to be?

4  A     No, Your Honor.

5  Q     Mr. Serpe, why didn't you comply with the Court order to

6  have disclosure -- full disclosure of your fees and expenses

7  paid in the three years as per the Court directive by March

8  15th?

9  A     The weekend of March 12th, Your Honor -- over the last two

10 years I've been suffering partial depression.  I lost my life

11 partner and my niece in the course of about three months about

12 two years ago.  So, I've been having some medical issues, Your

13 Honor.  And that was one of those weekends.  When I was back on

14 full service in the office on Wednesday, I went through the

15 Court's order.  My first instinct at that point was to sit down

16 with the Mentons and discuss with them, you know, where the

17 case was and what the status of the case was.  And subsequent

18 to that, I -- and that was what -- as I tried to reach out to

19 chambers on Monday was just to ask for additional time to

20 submit my affidavit.

21 Q     Mr. Serpe, you indicated that you had some health issues

22 and that was the reason why you didn't file.

23 A     Yes, Your Honor.

24 Q     But, in your very affidavit which is not then responsive

25 until -- to the Court's directive filed April the 25th, you

Serpe - Court                          19

1  stated that on March the 17th, you then proceeded to draft --

2  do a draft complaint on behalf of your clients against one of

3  the creditors.

4  A    Yes, Your Honor.

5  Q    You were well enough to do a draft complaint.  Why didn't

6  you follow the Court order on March 17th and instead respond to

7  the Court directive to file what you were directed to file?

8  A    Your Honor, I -- again, I apologize to the Court but my --

9  I have -- the only excuse I can give Your Honor was that that

10 week, I was under an intense and immense stress and I'd had a

11 bad episode that weekend, Your Honor.  And I wasn't in proper

12 game form and I obviously didn't comply with your order, Your

13 Honor.  And for that, I am sincerely apologetic.

14 Q    You just gave the circumstances as to when you called the

15 Court and requested an adjournment, did you not mention that

16 you had filed a motion to dismiss the case?

17 A    It was prior to that actually.  I had called up prior to

18 the filing of the motion to dismiss.  What I had done, Your

19 Honor, was I had called up the Court that morning, or I think

20 might have been early that afternoon, and I stated that it

21 would be -- we decided that we want to dismiss the case and I

22 wanted to obviously not, you know, dismiss without submitting

23 my time that I needed additional time to submit my affidavit

24 regarding my compensation in the case.  Subsequent to that, we

25 did file the motion to dismiss the case at that point because I

Serpe - Court                                                    20

1  think we needed -- I forget the exact reason, but I do not the

2  timing was this.  I made the phone call, made the request, and

3  then the filing was done subsequent to that.  In fact, I was --

4  I signed off on the filing and I was actually in the office to

5  make the phone calls those mornings to Your Honor's chambers or

6  to -- it might have been early afternoon, might have been 1:00

7  or 11:00, I -- to be frank, I'm not --

8  Q    I can say it was after 2 p.m. because we have a

9  requirement that adjournments are cut off at 2 p.m.

10  A    And I had spoken actually, Your Honor, when I called in,

11  someone had advised me that someone was at lunch but one of the

12  case administrators, I believe would be calling me back.  And

13  that was -- but I did call, Your Honor.  And I can get my -- or

14  I can have my phone records produced to see what time the phone

15  call was at but I had requested additional time in order to

16  submit the affidavit.

17  Q    Are you aware that your client -- you have two clients in

18  this case -- are you aware that Roy Menton was not in favor of

19  having the dismissal?

20  A    Well, Your Honor, when we met on -- I was aware of what

21  his testimony was.  When we met on Thursday and Friday, Your

22  Honor, I'm not exactly sure how much I can -- I mean, I don't

23  want to necessarily waive client privilege but in those

24  discussions, three things basically came up.  One was that the

25  loan modification being successful, the second that the

Serpe - Court                                    21

1  likelihood that they could with the money saved in the 13 plans

2  so far as well as with just what they'd be putting aside with

3  what their larger plan payment was that we could settle out the

4  debts, and thirdly was looking at really all the things that we

5  started putting together in respect to this claim, a decision

6  was reached right then to dismiss the case.

7          I think Mr. Menton's issue, Your Honor, was this.

8  Having looked at the claims with the creditor, my office was

9  drafting up this complaint for -- the drafting of the

10 complaint.  And, Your Honor, if I could just back up for a

11 second, while we were drafting the complaint, I actually also

12 was working on the time sheets and the time hours, as well, for

13 you in this court.  I've been working on this thing for a while

14 in putting this together.  There --

15 Q    Did you ever ask for an adjournment or for an extension of

16 time?

17 A    I did -- Your Honor, I did not.  I did ask for an

18 extension of time on that Monday.

19 Q    You asked to adjourn a hearing that was on confirmation.

20 A    I asked -- what my specific request, Your Honor, was I

21 asked that I be given additional time in order that I may be

22 able to submit my affidavit.

23 Q    Well, that was orally to a clerk that you just happened to

24 speak to when you called.  You didn't file anything in writing.

25 A    I did not file anything in writing, Your Honor.

1  Q    Mr. Serpe, on January 25th, you were in this courtroom and

2  your client, Maureen Menton, testified regarding a continuing

3  garnishment of her wages.

4  A    Yes, Your Honor.

5  Q    It was very clear from the Court's additional questions

6  that I was concerned that Sysco continued to garnish wages.

7  A    Yes, Your Honor.

8  Q    And you stood at counsel's table and did nothing to

9  disabuse the Court of that belief and in fact offered to

10 provide the judgment when the Court asked about where the

11 judgment was, in terms of what Sysco had recovered.  Do you

12 recall that?

13 A    Yes, Your Honor.

14 Q    And you indicated that you did not have a copy of the

15 judgment with you but you were going to send it to the Court,

16 with the understanding, because I announced on the record I was

17 going to do an order to show cause, to have counsel and the

18 creditor appear as to why they shouldn't be sanctioned for the

19 continuing garnishment.

20 A    Yes, Your Honor.

21 Q    My chambers subsequently, when they did not receive the

22 promised judgment, contacted you.  Why did you not respond to

23 the five times that chambers reached out to you to follow up

24 with what you represented in court?

25 A    Your Honor, I have no excuse.

Serpe - Court                                    23

1  Q    In fact, you had received directly from the law firm

2  reimbursement of monies that had been garnished that had been

3  in a trust fund.  Did you disclose that?

4  A    I did not that day, Your Honor.

5  Q    And the order that you read from, the paragraph that

6  directed you to make certain filings with the Court, asked you

7  to address any funds held on behalf of debtors in a trust

8  account for any reason, which would have been over the period

9  of 2009, 2010, 2011, including but not limited to any funds

10 returned from Sysco to Attorney Serpe as a result of the

11 wrongful garnishment.  Have you accounted for that to date?

12 A    Your Honor, I have not.  I actually -- I have not in this

13 affidavit and I apologize for that.  What I can say to you is

14 that, in fact, on my review we did receive and we are holding a

15 check from Sysco Corporation, or we're holding on to funds at

16 that point, Your Honor, from Sysco.

17 Q    And --

18 A    Your Honor, on that garnishment, the --

19 Q    No, I want to hear about the trust funds that you're

20 holding that are funds of this debtor estate that are in a

21 trust account of yours.  How much are you holding?

22 A    Your Honor, it's $1250.

23 Q    To the penny?

24 A    I believe so, Your Honor, yes.

25 Q    And when were you planning on accounting for that if I had

Serpe - Court                                    24

1  not asked today specifically about it?

2  A    Your Honor, I was planning on turning those funds over to

3  the trustee.

4  Q    When were you planning on doing that?

5  A    I -- Your Honor, I -- the best I can tell you is on that

6  one as well, I received the check, I do have the $1250, Your

7  Honor, and I can turn it over to the trustee tomorrow.

8  Q    In what form did you -- how many payments did that

9  represent?

10  A    One check, Your Honor.

11  Q    There was one check?

12  A    Yes.

13  Q    In the amount of $1,250?

14  A    Yes, Your Honor.

15  Q    This Court proceeded to have an evidentiary hearing that

16  you were on the telephone with, where we had counsel from New

17  York City.  We had Mr. Shur defending his firm and himself,

18  Relin, Goldstein & Crane, and Mr. Shur filed an affidavit that

19  -- at Docket Number 37 in this case that had 49 paragraphs and

20  extensive exhibits explaining what his firm did and the steps

21  taken to cease the garnishment.  Attached to Mr. Shur's

22  affidavit is Exhibit I that shows not only a check made payable

23  to Sean Serpe but an endorsement by your firm.  Is that the

24  check you're referencing?

25  A    Yes, Your Honor.

1          THE COURT:  Carolyn, could you please hand this to

2   Mr. Serpe?

3   Q    Could you identify that check?

4   A    Yes, Your Honor.  Relin, Goldstein & Crane, LLP.

5   Q    What's the amount of that check?

6   A    Twelve hundred three dollars and forty-eight cents, Your

7   Honor.

8   Q    Is there another $56.52 that you --

9   A    They are -- that was what the account records showed for

10  the amount that I owed back or that -- the amount that we had

11  to cut out of the escrow on this one, Your Honor.  There are no

12  other funds that, from my review of files, there are no other

13  funds that we've received in escrow from the Mentons.

14  Q    So, are you modifying your testimony?  You just

15  affirmatively stated twice or three times that it's $1,250.

16  A    The number that I, Your Honor -- I had $1250.  So --

17  Q    You have $1250 in your trust account?

18  A    No, I'm saying $1250 was the demarcation of what was for

19  the Sysco garnishment.  I can go back and look at the original

20  check and check that, but we had listed them as $1250.

21  Q    And my question is did you receive anything else besides

22  this check --

23  A    No, Your Honor.

24  Q    -- that was released from Relin --

25  A    No, Your Honor.

Serpe - Court                                        26

1  Q     -- that they disclose in their affidavit, defending

2  themselves against a wrongful garnishment.

3  A     Yes, Your Honor.

4  Q     And you were aware of these circumstances as you stood

5  before this tribunal with this Court getting concerned about a

6  violation of the stay by a creditor in this case?

7  A     Yes, Your Honor.

8  Q     And why did you not bring it to the Court's attention in

9  accordance with your duties for proceedings before a tribunal

10 under Rule 3.3 of the Rules of Professional Conduct?

11 A     Your Honor, my understanding at that point -- and I'd

12 actually conferenced this and brought this to the Court's

13 attention -- which was the fact that the garnishment continued

14 and I'd actually called up Mr. -- Relin, Goldstein on several

15 occasions to try and figure out what was going on or why this

16 exact garnishment was continued.  And we had no idea that it

17 was a third party creditor that was doing it and at that point

18 we were just trying to advise the Court that we still had a

19 garnishment which was active.  And Your Honor, it was my deep

20 belief that it was the creditor who was garnishing.  And that's

21 my error, Your Honor, I realize that.  But, I thought that this

22 creditor was still garnishing, given what I saw in the

23 documentary evidence.

24 Q     And you -- did you go back to your office to confirm that?

25 A     To confirm?

Serpe - Court                                    27

1  Q    That your belief that the garnishment was continuing?

2  A    The garnishment had continued, Your Honor.  I mean, it was

3  through the second filing, it was the same amount that was

4  being garnished, just like in the first.

5  Q    Why did you not, when you realized with respect to this

6  judgment and the fact that they're -- are you aware that there

7  was another creditor out there?

8  A    I was not, Your Honor.

9  Q    There was a default.  On default, there was a motion

10 returnable before the Court today which the Court has removed

11 from the default procedures.  It sought to dismiss this case

12 with prejudice from refiling, filed by the trustee -- excuse me

13 -- recounting a number of deficiencies in terms of the way both

14 the '09 case and this case has been conducted.  Are you in

15 agreement that this case should be dismissed with prejudice?

16 A    Your Honor, I -- my clients do not -- I am, Your Honor.

17 My clients do not want to continue with the bankruptcy filing

18 at this point and I think that was something that was clearly

19 -- actually a discussion that I had with my clients during that

20 week of March -- or the week before the hearing with -- it was

21 pretty much pointed out to me by my clients.  If, you know, the

22 house was no longer in danger, there was no reason to be in

23 bankruptcy, considering the amounts that were saved and the

24 fact that Ms. Menton's income together with any funds that have

25 been saved at this point could be used to settle out debts.

Serpe - Court                                        28

1  Q     When the second case was initiated December the 11th, was

2  it -- June 16th, excuse me, of 2010 -- because of the proximity

3  of the earlier case dismissed for failure to make a filing, are

4  you aware that the stay was only in effect for the first 30

5  days of this case?

6  A     Correct, Your Honor.

7  Q     And you never moved to extend the stay.

8  A     Your Honor, at that point, the modification was in place

9  -- or the modification had been agreed to.  And that was

10 essentially, you know, the reason why we had had the stay in

11 place, as far as the other property that had already been lost

12 in the first bankruptcy case.

13 Q     But, you're aware that as a result that this case is

14 presumptively not filed in good faith because of the proximity

15 of the earlier dismissal.  Are you aware of that under Section

16 362?

17 A     I am not aware of that, Your Honor.

18 Q     And that a dismissal with prejudice would be for a period

19 of the debtor not being able to then file for another 180 days.

20 A     Your Honor, it is my error.  I've made errors on this

21 case.  That is clear.  If anyone obviously is going to be

22 penalized, it's going to be me.  I, in good faith, I believed

23 that I had complied with everything that needed to be complied

24 with, with the noticing of the order in the first -- or the --

25 of the plan in the first case.  And I did not realize that even

Serpe - Van Baalen                                    29

1  till later on, Your Honor, until I received that objection.  In

2  fact, at that time, as I do recollect, I was fairly confident

3  that we were going to be able to vacate the prior dismissal.  I

4  did not realize that the ECF filing was not put into place,

5  Your Honor.  I did not realize that.  I thought that had been

6  taken care of.  And even looking at the docket, Your Honor, I

7  looked at the docket on that and reviewed over the docket and

8  in looking at it, I didn't even pick it up on reviewing the

9  docket.

10        THE COURT:  Is there anyone else in the courtroom

11 today who wants to ask any questions of this witness?

12        MR. VAN BAALEN:  Yes, Your Honor.  Guy Van Baalen for

13 the U.S. Trustee.

14                      EXAMINATION

15 BY MR. VAN BAALEN:

16 Q    Mr. Serpe, in your retainer agreement that was executed by

17 yourself and your clients in March of 2009, that's the original

18 retainer agreement for debt settlement and modification

19 retainer, what is -- what do you mean in that particular

20 retainer agreement by debt settlement?

21 A    What debt settlement would be would be that obviously

22 there would be balances on certain debts that were owed and

23 tried to negotiate a lower balance, a payment plan, or anything

24 along those lines, not full payment.

25 Q    Would it include the filing of a bankruptcy?

Serpe - Van Baalen                            30

1  A    No, it would not.

2  Q    Okay.  But you do have some general language which says

3  restructuring of the personal and business debt including

4  mortgage, which could obviously be through a Chapter 13 plan.

5  That's why I'm asking.

6  A    No -- yes, it could.  But what the idea was was to work on

7  -- the clients did not want to file for bankruptcy when they

8  retained me.

9  Q    Now, the clients paid you a retainer of $2,000 over five

10 months at $400 apiece, is that correct?

11 A    Correct.

12 Q    And during that time that you were getting these payments,

13 did you work -- in fact, work on their case?

14 A    Yes, I did.

15 Q    And were you able -- were you successful at all in

16 restructuring any of their debt?

17 A    Every attempt to restructure was unsuccessful.  There were

18 not enough funds to settle the accounts and in fact during that

19 time period, the mortgage to Key Bank went into arrears.  That

20 was the mortgage on the primary property.

21 Q    Right.  So, during the time that they were paying you the

22 monthly installment on the retainer agreement, they weren't

23 paying their mortgage, is that correct?

24 A    I don't know if that's for certain but it might coincide.

25 Q    It seems to based upon your affidavit.

1  A    Yes, it certainly could.

2  Q    Okay.  And then, ultimately, it was decided that they

3  would file a Chapter 13, is that correct?

4  A    Correct.

5  Q    And why didn't you, at that time, request a fee for the

6  filing of a Chapter 13 if your retainer agreement did not

7  include that?

8  A    I'd been working with the Mentons for six months.  I'd

9  been working on the home loan modification.  I'd been working

10 on assisting with the Millens Bay Inn issues.  And, you know,

11 they were in a pretty desperate spot.  Maureen was getting

12 garnished.  The house was in foreclosure.  Everything was in

13 collection at that point.  And I didn't request a fee.

14 Q    Okay.  And then, you discussed the fact that a second

15 filing occurred.

16 A    Yes.

17 Q    And that was when?

18 A    That was June 16th, 2010.

19 Q    Okay.  And at that time, you were owed money, as you

20 indicated, for the prior filing fee?

21 A    Mm-mm.

22 Q    And then, you also needed the filing fee for the second

23 case.  Why didn't you ask your clients for the filing fee back

24 in June when you were about to file the new case?

25 A    It's a tough question.  I should have.  I didn't.

Serpe - Van Baalen                              32

1  Q    Okay.

2  A    I didn't, Mr. Van Baalan, I knew that they were in a

3  tough situation and I -- I'll tell you what.  I actually can --

4  I can tell you more why I didn't do it.  I -- it was an error

5  on my part.  You know, for a few months with this, I was trying

6  to go out of my way, you know, especially with the collection

7  of fee, the representations, working on the Millens Bay issues,

8  working on the home, working on the debts, it was a lot of

9  multiple fronts.  I saw these people were clearly in pain.  And

10 I forwarded the fee.  I mean, I even did that with the payment

11 of the first Chapter 13 payment.

12 Q    Right, I understand.  When did you make that Chapter 13

13 payment?

14 A    I think that was in January or February of 2010.

15 Q    So, from the prior case?

16 A    Yes.

17 Q    Okay.  So then, there came upon a time in September of

18 2010 when you sought -- invoiced your clients for the

19 reimbursement for all of those fees that you've discussed in

20 Paragraph 25, I believe, of your affidavit.  Why pick September

21 of 2010 then to seek reimbursement?

22 A    It was just -- we had done a lot of work on the case.  It

23 had been -- the matter had been going on for a long time.  I

24 have employees and I had to run a firm.  And I needed to be

25 reimbursed for those fees at that point.

Serpe - Van Baalen                                    33

1  Q    And you already acknowledged that you didn't request the

2  fees be paid through a Court order, is that correct?

3  A    Yes, I acknowledged that.

4  Q    Was -- did the clients come into some money at that

5  particular time that they were able to issue a check in full

6  for $2,000?

7  A    It -- at that stage of the game, I think it was less that

8  they had the funds, more that, you know, I think in --

9  actually, I know for myself by that point it was just the

10 simple fact that we had expended all of these fees and that the

11 representation had gone on.  And actually, there was an event,

12 now that I do recall, which was the fact that the loan was

13 modified.  Because the loan payment shrank down to $600 a month

14 from $2300.  It just -- it opened a lot of funds up at that

15 point.

16 Q    And what was the status of the debtor's plan at that

17 particular time that they -- that you received the payment?

18 A    The plan was not confirmed.

19 Q    Right.  And were they making payments?

20 A    Yes, they were.

21 Q    And were they current at the time that they paid you the

22 $2,000?

23 A    Yes.

24 Q    They were.

25 A    I believe so.  Actually, I can't -- I don't -- you'd have

Serpe – Van Baalen                                    34

1  to speak with Ms. Wilson but I do believe so.

2  Q    Did you file an amended 2016B statement after receipt of

3  those funds in September?

4  A    I did not.

5  Q    Okay.

6         MR. VAN BAALAN:  I have no further questions, Your

7  Honor.  Thank you.

8         THE COURT:  Mr. Serpe, is there any other statement

9  you want to make for the record?

10         MR. SERPE:  Yes, Your Honor.  Your Honor, I obviously

11  did not intentionally, although I did for my actions violate

12  the Court's orders and the Bankruptcy Rules and frustrated this

13  Court and cause the attorneys for Sysco to expend enormous

14  energy where they should not have.  I also in my 2016

15  statements and my statements of funds in this case were

16  completely incorrect, as I have testified here today.  And I --

17  all I can say for myself on this, Your Honor, is that I've been

18  trying my best on this case to save my clients' home and to

19  attempt to save or to rectify the business situation that they

20  were in.

21         I've been practicing bankruptcy law for ten years and

22  on this case, Your Honor, I made a lot of mistakes.  And for

23  that, I am sincerely and deeply apologetic to this Court.  I'm

24  proud to be a bankruptcy lawyer.  I'm proud to practice.  I

25  definitely see the issues that I did and the only statement I

Menton - Court                                    35

1   can make is that I know this Court has its duties and what it

2   must do, but please do not in any way take my actions to

3   signify that I was not trying to zealously advocate and help my

4   clients who were in need.

5         THE COURT:  You may step down, Mr. Serpe.  I'm going

6   to call the -- Mr. Roy Menton, please.  The Court's going to

7   take judicial notice of the record in terms of what's filed,

8   both in the 2009 cases and the 2010, so while we had -- I had

9   asked you to mark one of the exhibits, I think we're going to

10  be fine without marking them.  They're all from the record.

11  Please raise your right hand.

12              ROY EARLE MENTON, WITNESS, SWORN

13        COURTROOM DEPUTY:  Please state your full name and

14  spell your last name.

15        MR. MENTON:  Roy Earle Menton, M-e-n-t-o-n.

16                      EXAMINATION

17  BY THE COURT:

18  Q    Mr. Menton, you've been present in the courtroom while Mr.

19  Serpe has made some representations.  Could you tell me,

20  please, how much you paid for the first bankruptcy filing in

21  2009?

22  A    We paid a total of $2,000.

23  Q    And for the present bankruptcy filing, what have you paid?

24  A    Two thousand dollars.

25  Q    And what was your understanding as to the fees that were

Menton - Court                                         36

1  going to be required of you for the first filing and the second

2  filing?

3  A    I don't understand.

4  Q    Did you understand when -- at the outset how much it was

5  going to cost for you to file bankruptcy?

6  A    We were told it would be about 2,000 -- it would cost

7  $2,000.  At least, that was my understanding.

8  Q    Now, there was a hearing, the last hearing that we had,

9  that you were present and your counsel was not present.

10 A    Yes.

11 Q    You recall that hearing.

12 A    Yes.

13 Q    And you made a statement before the Court that your first

14 case had been dismissed due to a typographical error, do you

15 recall that?

16 A    Yes, I do.

17 Q    What is your understanding as to why that first case was

18 dismissed?

19 A    Well, first off, we were told it was due to a

20 technicality.  And in one of the hearings, I thought I heard

21 the word typographical, so that's why I mentioned typographical

22 at the last hearing.  I don't remember when I heard it, but it

23 was -- I thought I heard it in this court.

24 Q    And then, what is your understanding now as to why it was

25 dismissed?

Menton - Court                                                    37

1  A    That Mr. Serpe forgot to or failed to submit certain

2  paperwork to the Court.

3  Q    And is -- when did you first learn that?

4  A    I'm fully aware of it now.  I don't know it was as clear

5  -- if he's mentioned it as clear in the past as I do now.

6  Q    Okay.  So, you do understand it today.

7  A    Yes.

8  Q    Now, when the Court had a confirmation hearing last --

9  adjourned confirmation hearing and the Court mentioned that

10 there had been filed a motion to dismiss, you also made a

11 statement on the record.

12 A    Yes.

13 Q    And the Court asked you whether you and/or your wife had

14 authorized the filing, do you remember my question to you about

15 that?

16 A    Yes, if we wanted to dismiss the case.

17 Q    And?

18 A    And I said at this time, no.

19 Q    So that neither -- and you indicated that neither you nor

20 your wife had intended to dismiss this case.

21 A    Correct.

22 Q    Mr. Serpe has indicated that there was some meeting that

23 you had.

24 A    We did have a meeting a week or two prior.  Mr. Serpe's

25 working on a complaint for us.  We thought the complaint would

Menton - Court                                    38

1  be done before the court -- we were to meet in court.  We

2  hadn't heard from him Monday, Tuesday, obviously he wasn't

3  here.  And without him being here and with the attorney for

4  Citizens Bank saying that they wanted things to be dismissed

5  and put off for 180 days, any legal proceeding -- at least I

6  interpreted it any legal proceeding, I did not want the case

7  dismissed at that time.

8  Q    Let me ask you today.  So, it's your understanding that if

9  there was a motion to dismiss filed, there was no authorization

10 for it.

11 A    Excuse me?

12 Q    That you didn't authorize that motion.

13 A    At that time, yes.  Because I had no -- Mr. Serpe did not

14 contact me prior that that's what he was going to do.  We

15 thought certain things were going to be done prior, before

16 asking for a dismissal and they hadn't been done.

17 Q    Okay.  Let me ask you today, sir.  You've heard Mr. Serpe

18 indicate that he thinks it's in your best interest to have your

19 case dismissed.  Today, what is your opinion?

20 A    Overall, I would say yes, but at the same time, I just

21 want to make certain that I have all the information available

22 before I actually say so.  But, we're definitely leaning in

23 that direction.

24 Q    And are you aware that, at least up until yesterday, there

25 was a motion that had been noticed on default by the trustee --

Menton - Court                                    39

1  A    Yes.

2  Q    -- that unless there was a written response, the case

3  would be dismissed without a hearing.

4  A    Yes.

5  Q    And you're aware that there was no written response filed

6  to that.

7  A    Yes, I am.

8  Q    Okay.  Let me ask anyone else.  Is there anyone who --

9  A    Your Honor.

10  Q    I'm sorry.

11  A    I just want to say one thing --

12  Q    Go ahead, Mr. Menton.

13  A    -- and get it on the record.  In regards to the payments

14  from Sysco, I'm aware that Mr. Serpe didn't receive a check

15  from their attorney which he then signed over to -- I don't

16  think he signed over the check but he gave us that amount.  So,

17  I don't think he has that in his -- I'm missing the word off

18  the top of my head.

19  Q    Trust account.

20  A    Trust account, yes.  Because we received one check from

21  him, I believe, for $1,203 and change and we received another

22  one from the attorney directly for the $12,003.48.

23  Q    Thank you, Mr. Menton.  I appreciate it.

24        THE COURT:  Is there anyone else who has questions of

25  Mr. Menton?

1                    (No verbal response)

2          THE COURT:  Mr. Menton, thank you for being present

3    and testifying today.  You may step down.

4          The Court has gone to some length to set this hearing

5    today because I think it's essential that the Court preserve

6    the integrity of this Court and the proceedings before this

7    Court.  There's a lot of paperwork that this Court reviews

8    every day, every week, and we take the attorneys who practice

9    before us at their word, particularly when there are sworn

10   statements that are filed.  And the system works because of the

11   reliance upon what is filed.

12         From the testimony and from the background that I

13   have learned about both the 2009 case and the 2010 filings, the

14   confidence in the filings before this Court are undermined and

15   with respect to representations made by this particular

16   attorney, the Court has very severe doubts that it can rely

17   again on what might be represented to this Court.

18         The Court, in reviewing the Rules of Professional

19   Conduct adopted in New York State, April 1st, 2009, finds that

20   a number of the rules are implicated in this proceeding.  Rule

21   1.3, Diligence.  "A lawyer shall act with reasonable diligence

22   and promptness in representing a client."  The motion that was

23   filed by the trustee in this case recounts the history as to

24   all of the things that were not done timely by counsel in this

25   case that caused more work for the trustee's office, and of

1 course, more work for the Court.

2          The first Chapter 13 petition filed December 11th,

3 2009, plan was not filed until January 12th, 2010, only after

4 the trustee had filed a motion seeking conditional dismissal of

5 the case.  It was dismissed ultimately on March 11th, 2010 for

6 failure to file and serve the notice of confirmation hearing

7 that had been directed.

8          There was a vacation of the dismissal of that which

9 was scheduled to be heard on July 13th, 2010.  In the meantime,

10 we had another petition but the trustee appeared at the hearing

11 on July 13th, 2010 to respond to the motion, as did Jason

12 Centolella on behalf of Citizens Bank.  But, there was no

13 appearance on behalf of the debtors and the motion was denied.

14          The present case commenced June 16th, 2010.  It was a

15 requirement of the Code that the plan be filed within 30 days.

16 The debtors did not file that plan until July 23rd, 2010 and I

17 should add, that that plan that was filed July 23rd was only

18 weeks after the 2016 disclosure statement saying no fees for

19 the case.  And yet, the plan provision provides for payment of

20 $2,000 of the attorneys fees for the filing of the case.

21          There was no motion filed to extend the automatic

22 stay and under the provision of the Code, the case was

23 presumptively filed not in good faith.

24          We had a confirmation hearing initially scheduled

25 September 7th, 2010, adjourned twice based upon an adjournment

Decision                                    42

1   of the Section 341 meeting, finally sat down for November 23rd.

2   There were objections filed by active creditors.  We adjourned

3   out the confirmation hearing to January 25th, and that's the

4   hearing that I referenced at which I heard about the continued

5   garnishment of wages.  I pressed the attorney for information

6   and set an order to show cause on the Court's initiative so

7   that Joseph Shur and Relin, Goldstein, who in essence because

8   of the testimony and because of the absence of bringing other

9   factors before the Court, had to appear in response to that and

10  defend their firm and their name that they were not, in fact,

11  in violation of the stay.

12          There had been notice of deficiency issued with

13  respect to amended Schedules I and J which have not been

14  corrected to date.  March 2nd, the Court directed the debtors

15  to further amend Schedules I and J and provide an affidavit,

16  detailing and providing support for expenses because the

17  trustee had gone through a lot of effort to very carefully,

18  rather than the boilerplate objection we sometimes see,

19  articulate all the bases for why there were inaccuracies.  And

20  the debtors failed to comply through their counsel with that

21  order.  The debtors have been in Chapter 13 for 15 months and

22  have failed to propose the confirmable plan.

23          In addition to the Rule 1.3 diligence, Rule 1.4

24  communication requires that a lawyer shall keep the client

25  reasonably informed about the status of the matter.  I find

Decision                                    43

1  that that's wholly lacking in this case.  The definition of

2  informed consent which is set out is very clear that it was not

3  complied with in this case.  It denotes the agreement by a

4  person to a proposed course of conduct after the lawyer has

5  communicated information adequate for the person to make an

6  informed decision and after the lawyer has adequately explained

7  to the person material risks of the proposed course of conduct

8  and reasonably available alternatives.  1.5B of the Rules

9  addresses the lawyer's need to communicate to a client the

10 scope of the representation and the basis or rate of the fee

11 and expenses for which the client will be responsible.  Without

12 written agreements and an understanding of what the payments

13 are and certainly with the filings before this Court on the

14 2016B that are sworn statements that were clearly erroneous and

15 the Chapter 13 plans that contradict them, as well as other

16 statements that was not done here.

17        I also find that the lawyer did not properly

18 supervise in accordance with the Rules of Professional Conduct

19 underlings so that the paralegal did not have proper direction

20 with respect to not making the filing.  We can't blame a lack

21 of compliance with a Court directive based upon the failure to

22 supervise someone within the office.

23        And the conduct before the tribunal is what is

24 particularly disconcerting to this Court, that there was not

25 the proper candor, openness and disclosure that I expect of

Decision                                    44

1  attorneys appearing before the Court.  In an ex parte

2  proceeding, a lawyer shall inform the tribunal of all material

3  facts known to the lawyer that will enable the tribunal to make

4  an informed decision whether or not the facts are adverse.  And

5  those factors were not properly disclosed to this Court.

6          I find on a number of bases that Mr. Serpe, you have

7  not complied with the Rules of Professional Conduct.  I am

8  going to refer this to the district court because when I make a

9  finding that the Rules were not met, I need to make that

10 referral.  I'm going to ask that this record be ordered and the

11 transcript certified as part of this proceeding.  And I am

12 going to direct that the $2,000 that were received without

13 Court order, I'm going to sanction you for that $2,000 and

14 direct that that be made payable to the clerk of the Bankruptcy

15 Court within 30 days.  And that is my determination today.

16         MR. SERPE:  Thank you, Your Honor.

17         THE COURT:  Thank you.  The court's in recess.

18         COURTROOM DEPUTY:  All rise.

19                   *  *  *  *  *

20

21

22

23

24

25

# C E R T I F I C A T I O N

I, STEPHANIE SCHMITTER, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


/s/ Stephanie Schmitter

STEPHANIE SCHMITTER

J&J COURT TRANSCRIBERS, INC.   DATE:  May 10, 2011